IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA, :

    Plaintiff, :

    vs. :

MICHAEL FIELDS :

    and :

ERIC FIELDS, :

    Defendants. :

Case No. 3:09cr029(1) & (2)

JUDGE WALTER HERBERT RICE

---

DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANT
MICHAEL FIELDS (DOC. #21) AND MOTION OF DEFENDANT ERIC
FIELDS (DOC. #23) TO SUPPRESS EVIDENCE AND STATEMENTS

---

Defendants Michael Fields ("Michael") and Eric Fields ("Eric") are each charged in the Indictment (Doc. #15) with one count of possessing with intent to distribute in excess of 50 grams of crack cocaine and one count of possessing with intent to distribute cocaine. Much of the evidence supporting those charges was seized by police officers, after they had stopped and searched the vehicle which Michael was driving and in which Eric had been traveling as a passenger on February 26, 2009. As a consequence, Michael has filed a motion requesting that this Court suppress all evidence that was seized as a result of that search and any

statements he may have made to officers thereafter. See Doc. #21. Eric has joined in that motion. See Notation Order Sustaining Doc. #23. Over three days, this Court conducted an oral and evidentiary hearing on the Defendants' requests to suppress evidence and statements. The parties have filed their post-hearing memoranda. See Docs. ##39, 40, 41, 44 and 45. The Court now rules upon those motions, beginning by setting forth this Court's factual findings based upon the evidence presented at the oral and evidentiary hearing.

At around noon on February 26, 2009, Officer Daniel Reynolds ("Reynolds") of the Dayton Police Department was on routine traffic patrol, driving southbound on Salem Avenue, about to cross the Salem Avenue Bridge, when he observed a green Ford Thunderbird in front of him. That vehicle was being driven by Michael, with Eric as a passenger. Reynolds observed that vehicle, while being driven across the three-lane Salem Avenue bridge and, after activating its turn signal, move rapidly from the left lane of traffic on the bridge, through the center lane and, then, to the right lane. While moving from the left lane to the center lane of Salem Avenue, it came close to a red Jeep which was being driven in the center lane, although not so close as to cause the driver of the Jeep to slam on his brakes.

After the Ford Thunderbird had reached the right lane of Salem Avenue, it was driven right onto Robert Drive. Reynolds followed the Ford Thunderbird, traveling across to lanes of Salem Avenue, albeit behind the red Jeep, and then turning right on Robert Drive. When he turned onto Robert Drive, Reynolds activated the overhead lights on his cruiser. He did not activate the cruiser's siren. Although Reynolds was only about one car length behind the Ford Thunderbird,

that vehicle did not stop when Reynolds turned on the cruisers' overhead lights. On the contrary, the Ford Thunderbird continued along Robert Drive to the entrance ramp to southbound Interstate 75. Michael drove the Ford Thunderbird south on Interstate 75, until the exit for U.S. Rt. 35, where he proceeded west on that highway, until coming to the exit for Germantown Street. Michael pulled the Ford Thunderbird to the side of the road, shortly after he had driven onto Germantown Street from Rt. 35. Reynolds followed the Ford Thunderbird throughout.[1] As he followed that vehicle, Reynolds saw the driver and the passenger, on a number of occasions, reach under their seats and into the area of the rear seats.[2] Throughout his pursuit of the Ford Thunderbird, Reynolds did not observe it violate any traffic laws, other than failing to stop in response to Reynolds' activating the overhead lights on his cruiser and the incident on the Salem Avenue bridge.[3]

As Reynolds pulled his cruiser to the side of Germantown Street, directly behind the Ford Thunderbird, he requested that additional officers come to the scene of the traffic stop, in order to provide assistance. However, rather than merely wait in his cruiser for the backup, Reynolds approached the driver's side of the Ford Thunderbird and ordered Michael to exit that vehicle. Reynolds then arrested Michael for failing to obey his (Reynolds') command that he stop the Ford

---

[1] Reynolds estimated that the length of that journey was approximately two miles.

[2] Reynolds described those movements as furtive. Although he was in constant contact with the dispatcher and other officers while he followed the Ford Thunderbird, Reynolds did not inform anyone that he had seen the driver and passenger in that vehicle engage in such furtive movements.

[3] At about the time Michael was driving the Ford Thunderbird to the side of the road on Germantown Street, Reynolds' supervisor told him to discontinue his pursuit of that vehicle.

Thunderbird, after the lights on the top of the cruiser had been activated. After handcuffing Michael, Reynolds placed him in the back of his police cruiser. As he was placing Michael in handcuffs and walking him back to his cruiser, Reynolds observed Eric, who had remained seated in the front passenger's seat of the Ford Thunderbird, bending over and reaching down, as if he were putting something under his seat or removing something therefrom.

After he had secured Michael in the back of his police cruiser, Reynolds returned to the passenger's side of the Ford Thunderbird and ordered Eric out of that vehicle. As he was placing Eric in handcuffs, Officers Charles Hurley ("Hurley") and J.J. Bell ("Bell"), as well as Sergeant Judy Abshire ("Abshire"), all of the Dayton Police Department, responded to Reynolds request for assistance. Hurley took charge of Eric and escorted him back to his (Hurley's) cruiser. After Reynolds had explained the so-called furtive movements of Michael and Eric to Abshire, the latter searched the passenger compartment of the Ford Thunderbird, without discovering any contraband, evidence of criminal activity or firearms.

After Abshire had failed to discover anything during her search of the passenger compartment of the Ford Thunderbird, Reynolds decided to conduct an inventory search of that vehicle. He began in the trunk, where he discovered some documents bearing Michael's and Eric's names; however, Abshire told him to stop, because his search was exceeding that which is authorized for an inventory search. As a consequence, Reynolds contacted his dispatcher and requested that a K-9 unit be sent to the location of the traffic stop. Shortly thereafter, Officer William Geiger ("Geiger") of the Dayton Police Department arrived with a canine. The dog sniffed around the exterior of the Ford Thunderbird, scratching on the passenger's

side door and the rear quarter panel on the driver's side.  Believing that the dog's scratching indicated that controlled substances were located within, Reynolds, Bell and Abshire began to search that vehicle, commencing their activities in the trunk.[4] Ultimately, the officers discovered bags of crack and powdered cocaine behind the dashboard, in an area that could be accessed through the space in which the car's radio would normally be placed.[5]

While the foregoing activities were occurring, Hurley was in his cruiser, attempting to obtain identification for Eric.  Although Eric did not have any identification, Hurley had obtained from Eric his name, a social security number and a date of birth.[6]  Although Hurley entered that information into the computer in his cruiser, he was unable to discover Eric's identity through any of the computer bases to which he had access.  During the stop on Germantown Street, the only confirmation of Eric's identity Hurley was able to obtain was from Michael.

After the controlled substances had been discovered in the Ford Thunderbird, Michael and Eric were transported to the headquarters of the Dayton Police Department and placed in separate interview rooms.  Detective Timothy Braun

---

[4]During the time between the arrival of Hurley, Bell and Abshire at the location of the traffic stop on Germantown Street and that of Geiger and the dog, Reynolds spent part of his time interviewing Michael and checking his identity.  As a consequence of that process, Reynolds determined that Michael had been driving with a suspended driver's license.

[5]The radio in the Ford Thunderbird had been removed.

[6]Reynolds testified that Eric possessed an Illinois identification card in his brother's name with a picture on it that looked like his brother.  Hurley, in contrast, testified that Eric did not have identification.  Given that Hurley was the officer with responsibility over Eric, this Court accepts Hurley's testimony.  It bears emphasis that the Government did not introduce, as an exhibit, the Illinois identification card, which Reynolds testified was in Eric's possession.

("Braun") of the Dayton Police Department attempted to interview each of the Defendants separately, in order to see if one or both of them was willing to talk about the controlled substances that had been found in the vehicle in which they had been traveling. Braun discontinued those interviews after Michael said he wanted to speak with an attorney and after the detective concluded that Eric was not being truthful.

Herein, the question of whether to suppress the evidence seized from the Ford Thunderbird turns on three inquiries, to wit: 1) did Reynolds violate the Fourth Amendment rights of the Defendants by stopping that vehicle; 2) were the Defendants' rights under the Fourth Amendment violated as a result of their being detained after the traffic stop and before the controlled substances were discovered; and 3) did the search of the Ford Thunderbird, during which the controlled substances were discovered, violate the Defendants' rights under the Fourth Amendment. If, in resolving those three inquiries, this Court should decide that one or both of the Defendants' rights under the Fourth Amendment were violated, it will turn to the Government's assertion that suppression of the evidence seized is not warranted in accordance with the inevitable discovery doctrine. Before engaging in the foregoing analysis, however, the Court will address an argument raised by Michael, to wit: that the evidence must be suppressed, because Abshire's search of the passenger compartment, during which she failed to discover any contraband weapons or evidence, violated the Fourth Amendment.

Michael argues that Abshire violated his rights under the Fourth Amendment by her initial search of the passenger compartment of the Ford Thunderbird. In support of this argument, Michael places primary reliance on Arizona v. Gant, — U.S. —, 129 S.Ct. 1710 (2009).[7] Therein, the Supreme Court clarified the holding of New York v. Belton, 453 U.S. 454 (1981). In Belton, the Supreme Court had applied the search-incident-to-an-arrest exception to the warrant requirement, recognized in Chimel v. California, 395 U.S. 752 (1969), to vehicle searches, thus authorizing officers to conduct a warrantless search of the passenger compartment of an automobile after arresting one or more of its occupants. The Gant Court held that the exception to the warrant requirement recognized in Belton did not apply therein, because officers had handcuffed the defendant and placed him in the back of a police cruiser, before searching the passenger compartment of the vehicle in which he had been driving, rendering moot the rationale for permitting such searches (to prevent the suspect from gaining access to a weapon or destroying evidence).

Herein, this Court will assume, for sake of argument, that Abshire violated the rule established in Gant,[8] by searching the passenger compartment of the Ford Thunderbird, after Michael and Eric Fields had been handcuffed and secured in the back of police cruisers. Nevertheless, this Court cannot conclude that such a violation serves as the basis for suppressing any evidence seized from that vehicle. Abshire did not discover any contraband, weapons or evidence of criminal behavior

---

[7]The Government has not responded to this argument.

[8]It bears noting that the Supreme Court decided Gant more than two months after the passenger compartment of the Ford Thunderbird, in which Michael and Eric Fields had been traveling, was searched.

when she searched the passenger compartment of the Ford Thunderbird. Nor is there any basis for finding that she discovered anything that indirectly or inevitably led to the discovery of the crack and powdered cocaine therein. Therefore, one could not successfully argue that the discovery of those controlled substances was fruit of the poisonous tree, the poisonous tree being the violation of Gant. See United States v. Jones, 335 F.3d 527, 532 (6th Cir. 2003) (noting that "the fruit of the poisonous tree doctrine provides that evidence discovered as the indirect result of a Fourth Amendment violation is inadmissible") (internal quotation marks and citation omitted).

Accordingly, the Court rejects Michael's assertion that Abshire's violation of Gant serves as the basis for suppressing the crack and powdered cocaine that was seized from the Ford Thunderbird. The Court now turns to the question of whether the stop of that vehicle violated the Defendants' rights under that Amendment.

It is axiomatic that a police officer may legally stop an automobile when he has probable cause to believe that a traffic violation has occurred. United States v. Sanford, 476 F.3d 391, 394 (6th Cir. 2007). In the context of determining whether stopping a car for a traffic infraction violated the Fourth Amendment, the Sixth Circuit recently reiterated that "[p]robable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008). Thus, the question becomes whether Reynolds had a reasonable ground for believing that the Ford Thunderbird was being driven in a manner which violated a traffic ordinance.

Reynolds testified that he activated his overhead lights and attempted to stop the Ford Thunderbird, because of the manner in which it was driven across traffic lanes on the Salem Avenue bridge. Such a traffic violation is governed by § 71.07 of the Dayton Municipal Code, which provides in pertinent part:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic, or wherever the city traffic is lawfully moving in two or more substantially continuous lines in the same direction, the following rules apply:
> (A) A vehicle or trackless trolley shall be driven, as nearly as is practicable, entirely within a single lane or line of traffic and shall not be moved from such lane or line until the driver has first ascertained that such movement can be made with safety.

See also Ohio Rev. Code § 4511.39 (provision of the Ohio Revised Code upon which § 71.07 is based). This Court concludes that Reynolds had probable cause to believe that Michael drove the Ford Thunderbird on the Salem Avenue bridge in a manner which violated § 71.07. Reynolds testified that the vehicle moved across two lanes of traffic, without pausing and almost hitting a Jeep which was being driven in one of those lanes. Under those circumstances, Reynolds had a "reasonable ground for belief supported by less than prima facie proof but more than mere suspicion" for thinking that Michael had failed to ascertain that he could change lanes safely, before crossing two lanes of traffic. In reaching that conclusion, the Court rejects the Defendants' assertion that Reynolds lacked probable cause to believe that Michael had violated § 71.07, because the driver of the red Jeep in the center lane of the Salem Avenue bridge was not required to slam on the brakes of that vehicle in order to avoid colliding with the Ford Thunderbird.

Moreover, even if this Court had determined that Reynolds lacked probable cause to believe that a violation of § 71.07 had occurred, which it does not, it would nevertheless conclude that Michael drove the Ford Thunderbird in a manner which violated § 70.08(B) of the Dayton Municipal Code, which provides:

> (B) No person shall operate a motor vehicle so as to willfully elude or flee a police officer or other duly authorized traffic control assistant after receiving a visible or audible signal from a police officer or other duly authorized traffic control assistant to bring his or her motor vehicle to a stop.

Reynolds activated the overhead lights on his cruiser as he turned right onto Robert Drive from Salem Avenue. Rather than bring the Ford Thunderbird to a stop, Michael continued driving it for about two miles, before stopping on Germantown Street. Under those circumstances, this Court concludes that Reynolds had probable cause to believe that the Ford Thunderbird was driven in a manner violative of § 70.08(B).[9]

Accordingly, this Court rejects the Defendants' argument that Reynolds violated their Fourth Amendment rights by stopping the Ford Thunderbird, and turns to the question of whether one or both of the Defendants had their Fourth Amendment rights violated by being detained after the traffic stop and before the controlled substances were discovered in that vehicle.

---

[9]In reaching that conclusion, this Court rejects the Defendants' assertion that Reynolds lacked such probable cause, because there was no place to pull the Ford Thunderbird over, before it was driven onto Germantown Street. There is no evidence that Michael could not have pulled the Ford Thunderbird to the side of the road, before it had traveled to Germantown Street.

- 10 -

In United States v. Torres-Ramos, 536 F.3d 542, 553-54 (6th Cir. 2008), the Sixth Circuit reviewed certain established principles concerning the detention of suspects seized as a result of a traffic stop:

> [O]nce the purpose of the traffic stop is completed, a police officer "may not 'further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" United States v. Blair, 524 F.3d 740, 752 (6th Cir. 2008) (quoting United States v. Perez, 440 F.3d 363, 370 (6th Cir. 2006)). Thus, in order to detain the motorists beyond the purpose of the original traffic violation, which was to issue a speeding ticket, Trooper Coverstone must have had a reasonable and articulable suspicion that criminal activity was afoot. United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999). Otherwise, the continued detention constituted an illegal seizure of the van's occupants. See Terry v. Ohio, 392 U.S. 1, 18 (1968).

Id. at 550.

Herein, it cannot be questioned that the post-stop detention of Michael comported with the Fourth Amendment. As soon as the Ford Thunderbird came to a stop, Reynolds ordered Michael out of that vehicle and placed him under arrest for failing to obey his (Reynolds') order to stop the vehicle, in violation of § 70.08(B). Based upon the above reasoning, this Court concludes that Reynolds had probable cause to arrest Michael for violating that Dayton Ordinance.

The detention of Eric poses a much more difficult hurdle for the Government to surmount. It bears emphasis that, after Reynolds had secured Michael in the back of his cruiser, he removed Eric from the Ford Thunderbird and handcuffed him. When the other officers arrived at Germantown Street, Reynolds turned Eric over to Hurley, who secured that Defendant in the back of his cruiser. To justify that detention, the officers were required, at a minimum, to have reasonable and articulable suspicion that Eric was involved in criminal activity. See Torres-Ramos, supra. The Government initially argues that the officers possessed reasonable

suspicion, justifying the detention of Eric, because of his so-called furtive movements which Reynolds had observed when he was following the Ford Thunderbird from Robert Drive to Germantown Street, and, after the Ford Thunderbird had come to a stop on Germantown Street, as he was handcuffing Michael and walking him to his cruiser. Assuming for sake of argument that Reynolds' observations of Eric gave the officer reasonable suspicion to detain the latter after the Ford Thunderbird had been stopped, that suspicion was almost immediately eliminated, as a result of Abshire searching the passenger compartment of that vehicle and failing to discover controlled substances, weapons or evidence of any criminal conduct.

The Government also points to Reynolds' testimony to the effect that, as he led Michael to his police cruiser, he (Reynolds) smelled marijuana on him (Michael). See Doc. #41 at 10. While that fact may have given the Government reasonable suspicion to believe that Michael was engaged in some sort of criminal activity involving marijuana, the Government has failed to explain how the odor of marijuana emanating from Michael establishes reasonable suspicion to believe that Eric was involved in a controlled substances offense, particularly since there was no evidence that either Eric or the interior of the Ford Thunderbird also smelled of marijuana.

In addition, the Government points to the fact that, by the time Reynolds handcuffed Eric, the Ford Thunderbird had been driven about two miles, while failing to stop in response to Reynolds activating the overhead lights on his cruiser. Id. The Government has failed to explain, however, how that fact gave Reynolds reasonable suspicion to believe that Eric was involved in criminal activity. It bears

emphasis that Reynolds testified that, in response to his question as to why Michael had failed to pull over, the latter had indicted that his driver's license had been suspended. Quite simply, the fact that Michael was driving on a suspended driver's license does not create reasonable suspicion to believe that Eric was involved in criminal conduct.[10]

Accordingly, the Court concludes that Eric's detention after Abshire's non-fruitful search of the passenger compartment of the Ford Thunderbird violated his rights under the Fourth Amendment. Consequently, the evidence seized from the Ford Thunderbird must be suppressed, <u>as to Eric</u>, unless it would have been ultimately discovered under the inevitable discovery doctrine. See <u>Torres-Ramos</u>, <u>supra</u> (holding that, even though the driver of a van lawfully stopped for a traffic violation was constitutionally detained and the other defendants were without a reasonable expectation of privacy in the van, evidence seized from the van must be suppressed <u>as to the other defendants</u>, if <u>they</u> had been unconstitutionally detained). As to Michael, however, this Court must decide whether the search of the Ford Thunderbird violated the Fourth Amendment, a question to which this Court now turns.

---

[10]The Government also points out that Reynolds' concerns for his safety were heightened, given that he was alone when he stopped the Ford Thunderbird. Putting aside the Court's skepticism that an officer's concern for his safety based solely on his being alone legally justifies the continued detention of the passenger in a motor vehicle lawfully stopped for violating a traffic ordinance (see <u>Arizona v. Johnson</u>, — U.S. —, 129 S.Ct. 781 (2009) (holding that police must have reasonable suspicion to believe that the passenger in an automobile stopped for a traffic infraction is armed and dangerous, in order to justify patting down that individual)), Reynolds was joined by three other officers shortly after the Ford Thunderbird came to a stop, thus alleviating any heightened concern for his own safety.

The evidence established that the search of the Ford Thunderbird occurred as a result of the dog's scratching on the passenger door and the rear quarter panel on the driver's side of that vehicle, after it had been brought to the scene by Geiger. The Sixth Circuit has noted that:

> A warrantless search of an automobile is permissible if probable cause exists to believe it contains evidence of a crime. United States v. Ross, 456 U.S. 798, 809 (1982). There is probable cause to justify a warrantless search of a vehicle once a properly trained and reliable drug detection dog alerts positively to the presence of drugs. United States v. Hill, 195 F.3d 258, 273 (6th Cir. 1999).

United States v. Perez, 440 F.3d 363, 374 (6th Cir. 2006), cert. denied, 549 U.S. 1014 (2006). See also United States v. Diaz, 25 F.3d 392, 393-94 (6th Cir. 1994) (holding that "[a] positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance" and that, to establish such probable cause, "the training and reliability of the dog must be established"); Torres-Ramos, 536 F.3d at 553-54 (same).

Herein, the Government failed to introduce evidence establishing that the canine in question had been properly trained or was reliable. Therefore, this Court is unable to conclude that the dog's reaction to that vehicle established probable cause to believe that controlled substances were located therein. Accordingly, as with Eric, the controlled substances seized from the Ford Thunderbird must be suppressed, as to Michael, unless the Government has proven that the crack and powdered cocaine would have been inevitably discovered thereafter.

In United States v. Keszthelyi, 308 F.3d 557 (6th Cir. 2002), the Sixth Circuit reviewed the inevitable discovery doctrine:

> In Nix v. Williams, 467 U.S. 431 (1984), the Supreme Court recognized an exception to the exclusionary rule for evidence seized in violation of the Fourth Amendment that inevitably would have been discovered by lawful means. Nix held that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Id. at 444 (holding that murder victim's body discovered pursuant to illegal search should not be excluded where evidence showed that volunteer search party would have discovered the body in the absence of police misconduct). This circuit has held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." United States v. Kennedy, 61 F.3d 494, 499 (6th Cir. 1995), cert. denied, 517 U.S. 1119 (1996). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999), cert. denied, 528 U.S. 1161 (2000). Although some speculation about how events would have unfolded in the absence of the illegal search is necessary under this doctrine, "we must keep speculation at a minimum by focusing on demonstrated historical facts capable of ready verification or impeachment." Id. (quotation omitted).

Id. at 573-74.

Herein, the Government argues that the crack and powdered cocaine would have been inevitably discovered, because the Ford Thunderbird would have been towed and an inventory search of it conducted. In United States v. Smith, 510 F.3d 610 (6th Cir. 2009), the Sixth Circuit discussed inventory searches:[11]

---

[11] An inventory search in which the controlled substances might have been discovered is not the inventory search which Reynolds started at the side of Germantown Street, after Abshire had failed to discover anything during her search of the passenger compartment of the Ford Thunderbird. Parenthetically, neither Defendant has argued that the Court should suppress the documents Reynolds discovered during that search. If either or both had, this Court would have

- 15 -

> A valid inventory search conducted without a warrant does not violate the Fourth Amendment. South Dakota v. Opperman, 428 U.S. 364, 369-71 (1976); [United States v. Decker, 19 F.3d 287, 289 (6th Cir. 1994)]. Inventory searches "'serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" [United States v. Lumpkin, 159 F.3d 983, 987 (6th Cir. 1998)] (quoting Colorado v. Bertine, 479 U.S. 367, 372 (1987)). In order to be deemed valid, an inventory search may not be undertaken "for purposes of investigation," and it must be conducted "according to standard police procedures." Id. (citing Florida v. Wells, 495 U.S. 1, 5 (1990)). However, the mere fact that an officer suspects that contraband may be found in a vehicle does not invalidate an otherwise proper inventory search. Id. (citations omitted).

Id. at 650-51. See also United States v. Tackett, 486 F.3d 230, 232 (6th Cir. 2007) (noting that "officers must conduct a permissible inventory search in good faith, not as a pretext for criminal investigation and that, [i]n conducting an inventory search, officers do not enjoy their accustomed discretion; they simply follow the applicable policy) (citations omitted). "Whether a police department maintains a written [inventory] policy is not determinative, where testimony establishes the existence and contours of the policy." Id. at 233.

Herein, this Court agrees with the Government that the evidence establishes that the Ford Thunderbird was going to be towed, given that the owner of that vehicle was not present, and that Michael, the person who had been driving it, did not have a valid driver's licence.[12] Finally, there is no evidence that Eric possessed

---

declined to do so, since they would have been inevitably discovered during the inventory search that would have occurred as a result of that vehicle being towed.

[12]The Defendants have pointed out that Reynolds and the other officers did not try to contact the vehicle's owner to request that she come to the scene to retrieve her vehicle. The Defendants have not, however, pointed to a provision in Dayton's tow policy, which would prohibit a vehicle from being towed, without first contacting its owner. Therefore, this Court is unable to conclude that the failure to contact the owner of the Ford Thunderbird, before towing that vehicle, calls into

a valid driver's licence on February 26, 2009, which would have obviated the need for towing, as he could have driven the automobile from the scene. Instead, the evidence established that, under Dayton's tow policy, an inventory search of the Ford Thunderbird would have been conducted, pursuant to Dayton's standard police policy. The Government did not present, however, evidence tending to establish that, in accordance with a routine inventory search, conducted in order to protect the owner's property while in police custody, officers would have searched the location where they discovered the crack and powdered cocaine, i.e., the area behind the dashboard which could be reached through the cavity where the radio normally would have been. Indeed, such a search would certainly raise the specter that it was conducted for investigatory purposes, rather than as an inventory search.

Accordingly, this Court cannot find that the Government established by the preponderance of the evidence that it would have discovered the crack and powdered cocaine by lawful means, if Eric had not been detained unconstitutionally and the Ford Thunderbird had not been unlawfully searched. Consequently, the Court concludes that the crack and powdered cocaine that was seized from that vehicle must be suppressed.

In addition, Defendants argue that any statements made by either Defendant to Braun must be suppressed, because that officer failed to give them the warnings required by Miranda v. Arizona, 384 U.S. 436 (1966), and the Government failed to prove that the Defendants knowingly and intelligently waived their rights. This

---

question the lawfulness of the inventory search of same.

Court need not consider those questions, given that any statements the Defendants made to Braun must be suppressed under the fruit of the poisonous tree doctrine. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963) (establishing fruit of the poisonous tree doctrine and holding that the exclusionary rule applies both to evidence discovered as a direct result of the violation of the Fourth Amendment and to evidence discovered as an indirect result of such an invasion, i.e., statements).

Based upon the foregoing, the Court sustains the Motions to Suppress Evidence and Statements filed by Defendant Michael Fields (Doc. #21) and Defendant Eric Fields (Doc. #23).

April 23, 2010

                                  WALTER HERBERT RICE, JUDGE
                                  UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.